**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————————

AVRAM L. GOTTLIEB,                     :
                                       :
              Petitioner,              :        Civ. No. 16-4213 (FLW)
                                       :
      v.                               :
                                       :        **OPINION**
STEVEN JOHNSON et al.,                 :
                                       :
              Respondents.             :
——————————————————————— :

**<u>FREDA L. WOLFSON, U.S.D.J.</u>:**

### I.        INTRODUCTION

Petitioner, Avram L. Gottlieb ("Gottlieb"), is a state prisoner incarcerated at New Jersey State Prison, in Trenton, New Jersey.  He is proceeding *pro se* with this habeas petition filed under 28 U.S.C. § 2254.  Presently before the Court is a motion filed by Respondents, Steven Johnson and the Attorney General of the State of New Jersey (collectively, "Respondents"), to dismiss the petition as untimely.  (ECF No. 15.)  Also before the Court are two motions by Gottlieb to hold oral argument on the dismissal motion, (ECF Nos. 17 & 20), as well as a motion to stay this matter for further proceedings in the state court. (ECF No. 22.)  For the following reasons, Gottlieb's motions to hold oral argument are denied, Respondents' dismissal motion is granted, Gottlieb's motion to stay the proceeding is denied as moot, and the petition is dismissed as untimely.

## II.    BACKGROUND

### 1.   Gottlieb's Conviction

In June 1995, Petitioner, Avram L. Gottlieb, [1] was indicted in New Jersey Superior Court, Law Division, Somerset County, for charges of first-degree felony murder, under New Jersey Statutes Annotated § ("N.J.S.A.") 2C:11-3a(3), second-degree possession of a handgun for an unlawful purpose, under N.J.S.A. 2C:39-4a, second-degree conspiracy to commit robbery, under N.J.S.A. 2C:5-2 and 2C:15-1, first-degree robbery, under N.J.S.A. 2C:15-1, third-degree possession of a weapon without a permit, under N.J.S.A. 2C:39-5b, and third-degree theft, under N.J.S.A. 2C:20-3.  On November 7, 1997, a jury acquitted Gottlieb of felony murder and of robbery as to Jeffrey Wolf, one of the two purported victims, but convicted him of the remaining counts.  The New Jersey Superior Court, Appellate Division has described the underlying events as follows:

> The convictions arose from an apparent robbery of a jewelry store . . . on March 14, 1995.  According to the testimony of defendant, it was a sham burglary arranged by the owner of the store, Jeffrey Wolf, to collect insurance.  Presumably the jury had a reasonable doubt whether this was so because it convicted defendant of robbing Mr. Wolf's wife but did not convict him of robbing Mr. Wolf.
>
> Whatever the initial motivation, in February 1995 defendant recruited three others, Kennon, Williams and Guhse, to assist in the robbery.  He planned the event and furnished the others with the necessary equipment, including loaded handguns for each.  At his direction a motor vehicle was stolen for use during the robbery.

---

[1]  Gottlieb indicates that he was convicted under the name "Avram *David* Gottlieb."  (Pet., ECF No. 1, at 1.)

   At the time of the robbery, defendant remained in the car, acting, in popular vernacular, as the wheelman.[2]  The other three entered the store.  When the nature of their presence became apparent, Jeffrey Wolf reached for a pistol and in an ensuing struggle with Kennon, fired a number of shots, some of which hit Kennon and one of which killed Wolf's wife Brenda.

   Evidence of the preparations for the crime and defendant's part as the primary planner was provided not only by defendant's own admissions and testimony at trial but also by the testimony of Kennon.  Additional corroborative evidence was presented in the form of fingerprints found on items used in the robbery, later recovered by the police from a nearby self-storage facility.

*State v. Gottlieb*, 2015 WL 2457951, at *2–3 (N.J. Super. Ct. App. Div. May 28, 2015) (omission in original) (quoting *State v. Gottlieb*, No. A-3391-97 (N.J. Super. Ct. App. Div. Feb. 15, 2000) (ECF No. 15-5), *certification denied* 165 N.J. 486 (2000)).  The Honorable Leonard N. Arnold, J.S.C., sentenced Gottlieb to life imprisonment with twenty-five years of parole ineligibility, as well as one five-year term to run concurrently, and one five-year term to run consecutively.

  The Superior Court, Appellate Division, affirmed Gottlieb's convictions and sentences on February 15, 2000.  (Br. in Supp., Ex. 1, ECF No. 15-5.)  The Supreme Court of New Jersey denied Gottlieb's petition for certification on July 7, 2000.  *State v. Gottlieb*, 165 N.J. 486 (2000).

  **2.  Efforts to Obtain State Post-Conviction Relief**

  On July 7, 2000, Gottlieb, then incarcerated in a federal prison in Indiana for an unrelated conviction, sent a letter to the state court, in which he requested appointment of counsel to pursue post-conviction relief ("PCR").  (Br. in Supp., Ex. 6, ECF No. 15-10.)  The Office of the Public Defender assigned Gottlieb's case to an attorney on July 24, 2000, then reassigned it to a

---

[2]  The Court notes that Gottlieb vehemently asserts that he ever drove the car.  Whether he did or did not is irrelevant for the purposes of this opinion.

second attorney on August 10, 2000, and then reassigned it again to attorney Jack Gerber on

November 14, 2000.  (Br. in Supp., Ex. 7, ECF No. 15-11, Ex. 8, ECF No. 15-12, & Ex. 9, ECF

No. 15-13.)

Gerber sent a letter to Gottlieb the following day, in which he noted the assignment.  (Br.

in Supp., Ex. 10, ECF No. 15-14, at ECF pp. 5–6.)  Gerber explained various rules regarding

PCR petitions and attached two forms for commencing PCR proceedings.  (*Id.*)  Gerber indicated

that he had filled out the forms "except for Paragraph 8 of Form 2 in which [Gottlieb] should set

out the requirements of Rule 3:22-8," which, as of 2000, required a petition to "set forth with

specificity the facts upon which the claim for relief is based, the legal grounds of complaint

asserted, and the particular relief sought."  *See* N.J. Ct. R. ("R.") 3:22-8 (2000).  Gerber asked

Gottlieb to send him the completed form and noted that, once he did, "we will move the case on

from there."  (ECF No. 15-14 at ECF pp. 5–6.)

Gottlieb sent Gerber an angry response on November 23, 2000, noting that he did not

want to write his brief *pro se* and that he "requested counsel so as to investigate the facts and law

of a complex case which resulted in my life being taken for a crime I did not commit."  (ECF No.

15-14 at ECF pp. 7–8.)  Gottlieb concluded his letter by stating that he expected Gerber to

immediately withdraw from representing him.  (*Id.*)

Gerber responded a few days later, stating that he considered Gottlieb's response "an

express statement that you will not comply with the requirements of Rule 3:22-8 that requires the

defendant to set out with particularity the facts upon which you claim relief, the legal basis for

such relief, and the particular relief that you seek from the petition."  (ECF No. 15-14 at ECF p.

9.)  Gerber further stated that he interpreted a telephone conversation they apparently had as his

"requisite personal contact" with Gottlieb and noted that he told Gottlieb "the necessity of

advising me of what you are complaining about so that I can assist you in properly preparing and presenting your claims to the court." (*Id.*) Gerber opined that no additional conversation would prove productive, and he informed Gottlieb that he would "proceed with the preparation and presentation of the case without any expectation of any further cooperation." (*Id.*) As Gottlieb had supposedly "explicitly stated that [he] ha[d] nothing to contribute to the case," Gerber wrote that he would not seek a writ to have Gottlieb produced for any argument, though he did write that Gottlieb will "receive a copy of whatever I submit to the Court and can submit any pro se documents that you belief would be helpful to your case." (*Id.*) Gerber concluded by noting that he would not withdraw from the case. (*Id.*)

Thereafter, Gottlieb apparently sent a letter to the Office of the Public Defender requesting assignment of a different counsel, which that office declined. (*See* Br. in Supp., Ex. 12, ECF No. 15-16, at ECF p. 11.) Gottlieb then sent a letter dated December 15, 2000 to the Superior Court, Somerset County, requesting other counsel ("the December 15, 2000 Letter"). (Br. in Supp., Ex. 10, ECF No. 15-14, at ECF pp. 1–2.) He included the letters he had exchanged with Gerber, and asserted that Gerber's stance was inappropriate. (*Id.*) Gottlieb claimed his innocence and asserted that he could prove it with adequate counsel. (*Id.*) He also alleged that his sentence was improper under the Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (holding that any fact increasing sentence beyond general statutory maximum must be found beyond reasonable doubt by jury). (*Id.*) He insisted, in the letter, that he was "still entitled to a real defense; not an offer to photocopy a pro-se brief." (*Id.*) In an addendum to his letter, Gottlieb rejected Gerber's statement that he had refused to comply with Rule 3:22-8. (ECF No. 15-14 at ECF pp. 3–4.) He noted that he had filed a bar complaint against Gerber and again requested that the court assign him new counsel. (*Id.*)

Gottlieb then filed a motion to substitute counsel, dated December 20, 2000, advancing the same arguments as the December 15, 2000 Letter. (Br. in Supp., Ex. 12, ECF No. 15-16.) The State took no position on this motion. (Br. in Supp., Ex. 13, ECF No. 15-17.) When the motion had not yet been decided, Gottlieb filed a "Motion to resolve Petition for Substitution of Counsel," dated February 8, 2001. (Br. in Supp., Ex. 14, ECF No. 15-18.) He noted the urgency of advancing his PCR proceeding "[d]ue to the statutory filing deadlines imposed by New Jersey law and federal statute should this case not be resolved at the state level." (*Id.*) Gottlieb submitted a follow-up letter to the clerk of the Superior Court dated February 15, 2001. (Br. in Supp., Ex. 15, ECF No. 15-19.) Gottlieb then sent another letter to the court dated March 27, 2001, in which he disputed any allegations that he was unwilling to cooperate with Gerber and sought to ensure that the proceeding would move forward, as he believed that he would remain incarcerated in Indiana beyond the deadline for filing a PCR petition. (Br. in Supp., Ex. 16, ECF No. 15-20.) He noted that he had spoken to "law clerks" in the Indiana prison, "but they are not versed in N.J. state law; nor do we have any access to N.J. STATUTES, procedures, or legal references." (*Id.*) He again concluded by urging the court to provide him some attorney other than Gerber. (*Id.*)

The Honorable Victor Ashrafi denied Gottlieb's motion on April 19, 2001, "determining that [Gottlieb] and Mr. Gerber need to make further efforts to work cooperatively toward the filing of the petition, and no good cause appearing for substitution of counsel under R.3:22-6(d)." (Br. in Supp., Ex. 17, ECF No. 15-21.) The Court directed Gerber to review *State v. Velez*, 329 N.J. Super. 128 (App. Div. 2000) (laying out standards for effective representation by assigned PCR counsel), but also reminded Gottlieb that he enjoyed no constitutional right to counsel in PCR proceedings. (*Id.*) Judge Ashrafi emphasized that New Jersey Court Rule 3:22-

6, which governs assignment of PCR counsel, "contemplates assignment of an attorney for an indigent defendant <u>after</u> a petition is filed by the defendant himself." (*Id.*) He noted that an appointed attorney must subsequently provide effective representation, and he construed Gerber's communications as "efforts to obtain movant Gottlieb's cooperation in fulfilling the procedural requirements of the Rule." (*Id.*) He stressed that "Gottlieb must make [a] good faith effort to cooperate with his assigned counsel in the preparation of his petition." (*Id.*)

Gerber wrote Judge Ashrafi a letter dated July 25, 2001 (copying Gottlieb), which, essentially, stated that he was committed in advancing the case, until Gottlieb provided arguments he wanted to advance or at least returned to New Jersey. (Br. in Supp., Ex. 18, ECF No. 15-22.) In that regard, Gerber explained that, while he had reviewed Gottlieb's case file, he could find no meritorious arguments to advance in a PCR proceeding. (*Id.*) Counsel also noted that Gottlieb had refused his request to fill out the petition form and that he was "not aware of any holding or dicta in any case involving petitions for post-conviction relief that requires an attorney to fabricate claims just so the defendant can advance a petition for post-conviction relief." (*Id.*) Gerber emphasized his experience working on PCR cases, and stated that he had "uniformly declined to provide the defendant with any legal analysis of the merits of any claim raised by a defendant in his petition as my view is that that posture is contrary to the last sentence of <u>R.</u> 3:22-6d." (*Id.*) Gerber explained, "In the present case I find no issues that arguably come within the scope of <u>R.</u> 3:22-2 while on the other hand I have attempted to fulfill my responsibilities to the defendant under <u>R.</u> 3:22-6d. Unfortunately the defendant has not been productive in satisfying that avenue for relief . . . ." (*Id.*) He concluded by asserting that he was "unable to advance the petition" and requested, on Gottlieb's behalf, "that the matter be put on an inactive calendar until the expiration of the period of limitations after which the defendant, if

he could then satisfy the requirements of R. 3:22-8, could file another petition and set forth the reasons in support of excusable neglect." (*Id.*) Gerber sent a follow-up letter shortly thereafter, primarily providing Judge Ashrafi an additional case for reference, in which he stated that he was "fully prepared and comfortable consistent with R. 3:22-6(d), with advancing any claim[s] that Mr. Gottlieb can reasonably articulate in support of his petition for post-conviction relief, notwithstanding that everything in the law and even science may facially be to the contrary, if only he were but to do so." (Br. in Supp., Ex. 19, ECF No. 15-23 (brackets in original).)

Gottlieb ultimately filed a *pro se* PCR petition in December 2002,[3] only days before his time to do so expired. (Br. in Supp., Ex. 3, ECF No. 15-7.) His petition asserted various grounds for relief: ineffective assistance of trial counsel; that the trial judge improperly divided the joint robbery charge against the Wolfs into two separate charges at the conclusion of the trial; that the trial judge failed to give instructions on joint possession; prosecutorial misconduct; and that his sentencing violated *Apprendi*. (*Id.*) After receiving this petition, the Office of the Public Defender assigned Gottlieb new PCR counsel. (Br. in Supp., Ex. 20, ECF No. 24.)

The Superior Court, Somerset County, denied Gottlieb's PCR petition without an evidentiary hearing on March 19, 2009. *See Gottlieb*, 2015 WL 2457951 at *3. After Gottlieb filed a reconsideration motion, a different judge granted Gottlieb an evidentiary hearing, but ultimately denied reconsideration on August 16, 2011. *See id.* The Superior Court, Appellate Division, affirmed this order on May 28, 2015. *Id.* The Supreme Court of New Jersey again denied certification on June 3, 2016. *State v. Gottlieb*, 226 N.J. 211 (2016).

---

[3] There is some ambiguity over whether Gottlieb submitted his PCR petition on the 16th or 20th of December 2002. The question need not be resolved in this opinion.

### 3.  The Habeas Petition

Gottlieb filed a *pro se* petition for a writ of habeas corpus with this Court on July 12, 2016, which asserts twelve grounds as bases for habeas relief.  (Pet., ECF No. 1, at 7–93.)  These include various arguments for ineffective assistance of trial and appellate counsel, including failure to adequately communicate with Gottlieb, failure to challenge various aspects of the prosecution's investigation and grand jury proceedings, failure to sufficiently investigate and prepare for proceedings, failure to present key witness and expert testimony, failure to object to unduly prejudicial evidence and testimony, failure to request mid-trial *voir dire*, failure to request proper limiting instructions and jury charges, failure by the Office of the Public Defender to appoint him new counsel when his appointed attorney was subject to investigation for wrongdoing, and overall abandonment of the defense.  (*Id.* at 7–47.)

Gottlieb also contends that his conviction and sentence resulted from "egregious prosecutorial misconduct," including use of investigators with personal and business relationships with the Wolfs in violation of New Jersey law, improper vouching for cooperating witnesses and the Wolfs, presentation of false and distorted evidence, subornation of perjury from Jeffrey Wolf, Kennon, and other witnesses, the improper introduction of Gottlieb's other criminal sentences and alleged crimes, the false characterization of Gottlieb to the PCR court as a "convicted murderer," and concealment of exculpatory witnesses.  (*Id.* at 47–59.)

Gottlieb further alleges that his conviction and sentence are the product of judicial misconduct.  (*Id.* at 59–74.)  He argues, among other things, that the trial judge deliberately violated his constitutional rights by forcing Gottlieb to proceed to trial before his counsel was fully prepared, using prejudicial language, failing to permit mid-trial *voir dire* despite extensive media coverage, improperly admitting evidence of other crimes and criminal sentences, failing to

give proper limiting instructions regarding the prison garb of cooperating witnesses, vouching, and guilty pleas of other defendants, and applying repealed law in denying a motion for judgment notwithstanding the verdict.  (*Id.*)

Of significance, Gottlieb urges that trial court's late amendment of his indictment, dividing the charge of robbing Jeffrey Wolf and Brenda Wolf together to separate charges of robbery of each Wolf, renders conviction for the robbery of Brenda Wolf unconstitutional under the Fifth and Fourteenth Amendments.  (*Id.* at 75–78.)  He claims that, even if such a split of the charge was permissible, the trial court should have given jury instructions regarding joint constructive possession, as Brenda Wolf could not have been a victim of robbery if she did not own what was stolen.  (*Id.*)  Gottlieb also claims that his conviction for theft of moveable property is unconstitutional given a deliberate misrepresentation by the prosecution to the grand jury that indicted him on that charge.  (*Id.* at 78–81.)  Gottlieb argues that cumulative error produced an unconstitutional conviction, that his sentence is insufficiently definite, and that his sentence was improperly enhanced in violation the Fifth, Eighth, and Fourteenth Amendments. (*Id.* at 84–93.)

While acknowledging the untimeliness of his petition, Gottlieb asserts that it should be considered anyway as he was a victim of criminal acts by the State.  (*Id.* at 95.)  He contends that equitable tolling should be applied as his assigned attorneys failed to assist in promptly filing a PCR petition or providing Gottlieb the materials he needed to do so himself.  (*Id.* at 95–96.) Gottlieb also asserts that he was barred from making *pro se* submissions while he had counsel. (*Id.* at 96.)  Finally, he contends that his claims show actual innocence, thus justifying a relaxation of any time bar.  (*Id.*)

### III.    THE PRESENT MOTIONS

**1.  Respondents' Motion to Dismiss**

After an extension of time to answer, the Somerset County Prosecutor's Office, on behalf

of Respondents, filed a motion to dismiss the petition as untimely.  (ECF No. 15.)  Respondents

argue that Gottlieb's one-year period to file a habeas proceeding under the Antiterrorism and

Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d)(1), expired on October 5, 2001—

one year after the end of Gottlieb's time to seek *certiorari* from the Supreme Court of the United

States on direct appeal of his conviction.  (Br. in Supp., ECF No. 15, at 4.)  While the filing of a

state PCR petition may toll the AEDPA limitations period, Respondents contend that no tolling

may apply, as Gottlieb did not file his PCR petition until fourteen months after the AEDPA

period ended.  (*Id.* at 4–5.)  Respondents argue that Gottlieb has not made any showing of actual

innocence or newly discovered, relevant facts.  (*Id.* at 36–38.)

 In his opposition papers, Gottlieb argues that his AEDPA limitations period should be

tolled beginning December 15, 2000, as his letter of that date substantially complied with New

Jersey's filing requirements for PCR petitions.[4]  (Br. in Opp'n, ECF No. 16, at 2–4.)  Gottlieb

asserts that his difficulties with Gerber warrant equitable tolling of his AEDPA limitations

period.  (*Id.* at 5–12.)  He also contends that new evidence of his actual innocence should permit

his petition to proceed, even if untimely.  (*Id.* at 13–41.)  Finally, Gottlieb briefly argues that his

petition should be heard as it is based on newly discovered evidence and as a matter of

fundamental fairness.  (*Id.* at 42–46.)

In reply, Respondents urge that the December 15, 2000 Letter did not constitute a

properly filed PCR petition, and thus could not have commenced tolling of the AEDPA

---

[4]  For the sake of clarity given the intricate issues involved, detailed recitations of the parties'
arguments are included in the Court's analyses of each issue, *infra*, rather than in this section.

limitations period.  (Reply Br. in Supp., ECF No. 18, at 1–10.)  They argue that, regardless of Gottlieb's disagreements with Gerber, there is no basis for equitable tolling, as Gottlieb could still have filed a PCR petition in time to toll the AEDPA period.  (*Id.* at 10–14.)  Respondents assert that Mr. Gottlieb's claims of actual innocence are roundly contradicted by the extensive evidence of his guilt, and they contend that the alleged discrepancies surrounding Brenda Wolf's killing provide very little support for Mr. Gottlieb's theory of events.  (*Id.* at 14–47.)  No ground exists, Respondents contend, to consider Gottlieb's petition on the basis of newly discovered evidence or fundamental fairness.  (*Id.* at 47–52.)

### 4.  Gottlieb's Motions for Oral Argument

Shortly after Respondents filed their dismissal motion, Gottlieb filed a motion seeking oral argument on that motion.  (ECF No. 17.)  He maintains that this case is extremely complex and that it would be "impossible for [him] to explain in writing alone, the interplay between what the new evidence proves, and its effects on a rational juror."  (*Id.*)

A few weeks later, Gottlieb filed another motion to renew his request for oral argument given the arguments advanced by Respondents in their reply brief on the dismissal motion.  (ECF No. 20.)  In support of this motion, Gottlieb primarily reiterates the arguments laid out in his opposition to the dismissal motion.  (*See id.*)

Respondents filed no opposition to Gottlieb's motions seeking oral argument.

### 5.  Gottlieb's Motion to Stay the Proceeding

Gottlieb also filed a motion characterized as motion for a stay and abeyance.  (ECF No. 22.)  He urges that, contrary to Respondents' suggestion, state courts "have never squarely addressed the constitutional questions presented herein."  (*Id.* at 1.)  He therefore requests a stay

and abeyance to allow him "to try one last time to compel the State (courts) to answer for their unconstitutional actions." (*Id.* at 2.) Gottlieb contends that the trial court, in denying his motion for judgment notwithstanding the verdict after the jury convicted Gottlieb of robbery of Brenda Wolf, but not Jeffrey Wolf, relied on a 1978 case that was, in turn, premised on a criminal statute that was repealed and replaced in 1979. (*Id.* at 2–4.) Despite his efforts, the state courts have not granted any relief on this basis. (*Id.* at 4.)

Gottlieb also argues that his sentencing violated *Apprendi*, as the trial court, in increasing the sentence beyond the typical maximum, relied on facts not found by the jury. (*Id.* at 5.) Gottlieb contends that *Apprendi* applies retroactively, as his case was still on direct appeal when the Supreme Court issued the *Apprendi* decision. (*Id.* at 5–6.) Gottlieb again argues that the state court has ignored his requests to raise this issue. (*Id.* at 6.) Accordingly, Gottlieb requests a stay so that he may move for the state courts to explain their decisions. (*Id.* at 6.)

Respondents oppose Gottlieb's motion for a stay, but contend that the issue is moot given the untimeliness of his petition. (ECF No. 23, at 1–3.)

## IV.    THE MOTIONS FOR ORAL ARGUMENT

Under Local Civil Rule 78.1, "[a]ll motions and other applications will be decided on the papers submitted unless . . . a party requests oral argument and the request is granted by the Judge." L. Civ. R. 78.1(b). Gottlieb's arguments are more than adequately set out in his brief in opposition to the dismissal motion. (*See* ECF No. 16.) Accordingly, the Court exercises its discretion to deny his motions for oral argument. *See United States ex rel. Hughes v. Rundle*, 419 F.2d 116, 118 (3d Cir. 1969).

## V.     TIMELINESS UNDER AEDPA

AEDPA creates a one-year limitations period for habeas petitions by state prisoners, which typically begins to run when the underlying judgment "bec[omes] final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A); *see also Thompson v. Adm'r N.J. State Prison*, 701 F. App'x 118, 121 (3d Cir. 2017); *Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013).  Where, as here, a habeas petitioner previously pursued direct appeal to a state high court, the limitations period begins to run upon the expiration of time to petition for *certiorari* from the Supreme Court of the United States.  *See Thompson*, 701 F. App'x at 121; *Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 84 (3d Cir. 2013).  The AEDPA limitations period is tolled, however, during any period that a properly filed PCR petition is pending in state court.  28 U.S.C. § 2244(d)(2); *see also Thompson*, 701 F. App'x at 121; *Jenkins*, 705 F.3d at 85.  As the AEDPA limitations period is not jurisdictional, it may also be equitably tolled in appropriate circumstances.  *See Holland v. Florida*, 560 U.S. 631, 645–49 (2010).  A new AEDPA limitations period will also begin to run when new factual evidence that forms the basis for a habeas claim becomes discoverable to the petitioner.  *See* 28 U.S.C. § 2244(d)(1)(D); *see also McQuiggin v. Perkins*, 569 U.S. 383, 388–89 (2013).

## VI.     ANALYSIS OF THE DISMISSAL MOTION

In this case, the AEDPA limitations period began running on October 5, 2000, or ninety days after the Supreme Court of New Jersey denied Gottlieb's petition for certification, when the time to seek *certiorari* from the Supreme Court of the United States expired.  Sup. Ct. R. 13(1).

Consequently, it appears that the period to file a timely habeas petition had expired by October 6, 2001—well before Gottlieb filed his PCR petition in December 2002.

Gottlieb raises several distinct arguments in an effort to avoid this time-bar:  (1) that the December 15, 2000 Letter should be construed as a properly filed PCR petition, thus triggering statutory tolling under AEDPA; (2) that Gerber's conduct justifies equitably tolling the AEDPA limitations period; (3) that evidence sufficiently demonstrates his actual innocence to justify disregarding the standard one-year limitations period, under *McQuiggin*; (4) that newly discovered facts underlying his arguments triggered a new AEDPA limitations period under 28 U.S.C. § 2244(d)(1)(D); and (5) that principles of fundamental fairness require that the Court address the merits of his petition.  (*See* ECF No. 16.)  The Court addresses each of these arguments in turn.

### 1.   The December 15, 2000 Letter as a Properly Filed PCR Petition

As noted above, the AEDPA limitations period for a habeas petition will be tolled while a properly filed PCR application is pending before the state courts.  28 U.S.C. § 2244(d)(2).  Such an application is considered properly filed "when its delivery and acceptance are in compliance with the applicable laws and rules governing filings."  *Artuz v. Bennett*, 531 U.S. 4, 8 (2000); *see also Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005); *Satterfield v. Johnson*, 434 F.3d 185, 191– 92 (3d Cir. 2006).  Thus, while the merit or procedural aspects of the claims in such an application are not considered, the propriety of a filing may be assessed by its compliance with rules governing, "for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee."  *Artuz*, 531 U.S. at 3–4; *see also Satterfield*, 434 F.3d at 191–92.

Gottlieb argues, for the first time in his papers opposing this motion, that his AEDPA limitations period should be tolled beginning December 15, 2000, as his letter of that date substantially complied with New Jersey's filing requirements for PCR petitions.  (ECF No. 16 at 2–4.)  He contends that the December 15, 2000 Letter essentially constituted a PCR petition, as he sent it to the Court, he identified his indictment number, he raised challenges to the conviction, and he requested counsel.  (*Id.*)  Acknowledging that a New Jersey PCR petitioner generally files a petition *pro se* before appointment of PCR counsel, he posits that, as a state court appointed him PCR counsel upon receipt of the December 15, 2000 Letter, it must have either considered it a PCR petition or have been acting in breach of protocol.  (*Id.* at 6–7.)

Respondents urge that the December 15, 2000 Letter did not constitute a properly filed PCR application and thus, could not have commenced tolling of the AEDPA limitations period.  (ECF No. 18 at 1–10.)  Respondents argue that Gottlieb never before made this allegation and that, contrary to his representation, his letter in fact complains about the fact that his counsel has not yet filed a PCR petition.  (*Id.* at 1.)  Respondents also contend that this argument is directly contradicted by Gottlieb's prior representations to this Court that he filed his PCR petition in December 2002, and by his statements made between December 2000 and December 2002, which indicate that he was not aware that any petition have been filed before December 2002.  (*Id.* at 1–5.)  Respondents stress that the December 15, 2000 Letter was not in the proper form to be considered a PCR petition, as it completely disregards the requirements of New Jersey Court Rule 3:22-8—failing to be verified, to recount any facts with specificity, or to seek particular relief.  (*Id.* at 5–10.)

The December 15, 2000 Letter, titled as a "LETTER MEMORANDUM" and bearing the subject line "Appointment of Post-Conviction Relief counsel in <u>N.J. v. Gottlieb</u>," is two pages

long, with a two-page addendum, and primarily focuses on requesting that the court to appoint

Gottlieb new counsel in place of Gerber.  (*See* ECF No. 15-14 at ECF pp. 1–2.)  It recounts

Gottlieb's appointment of various counsel and his disagreements with Gerber.  (*Id.*)  While it

makes passing references to Gottlieb's claims that he is innocent of "the principal charges" and

that his sentence violated *Apprendi*, it focuses on counsel-related issues.  (*Id.*)  The Addendum,

designated as being "in further support of my request for your help in securing new counsel,"

reiterates Gottlieb's complaints regarding Gerber and his desire to properly advance his case.

(*Id.* at ECF pp. 3–4.)

Indeed, I find that this letter could no way be construed as a properly filed PCR

application.  The iteration of New Jersey Court Rule 3:22-8 applicable in December 2000 (like

the current version) established requirements for PCR petitions, including that such a petition

"shall be verified by defendant and shall set forth with specificity the facts upon which the claim

for relief is based, the legal grounds of complaint asserted, and the particular relief sought."  R.

3:22-8 (2000).  The December 15, 2000 Letter is not verified by Gottlieb, and, while it mentions

two potential legal grounds (actual innocence and improper sentencing), it includes no

underlying facts, much less facts with specificity.  (*See* ECF No. 15-14.)  Furthermore, it does

not seek any particular relief aside from appointment of new counsel.  (*Id.*)  Rule 3:22-8 also

required that PCR petitions include a variety of particular information regarding the underlying

trial, appellate process, and other efforts to obtain relief.[5]  R. 3:22-8 (2000).  The December 15,

_____

[5]  The rule specifically mandated that a petition include:

> (a) the date, docket number, and content of the indictment or accusation upon
> which the conviction was based and the county where filed; (b) the date and
> content of the sentence or judgment complained of and the name of the presiding
> judge; (c) any appellate proceedings brought from the conviction, attaching a
> copy of opinions therein; (d) any previous post-conviction proceedings relating to
> the same conviction, giving date and nature of claim and date and nature of

2000 Letter includes virtually none of this information besides the underlying indictment number and county of conviction.  (*See* ECF No. 15-14).  As the December 15, 2000 Letter did not remotely comply with the state court rules regarding form of a PCR petition, this document cannot be considered a properly filed application for the purposes of AEDPA.  *See Artuz*, 531 U.S. at 3–4.

Furthermore, the Court notes that neither the state court nor Gottlieb himself at any time before this motion practice suggested that the December 15, 2000 Letter might constitute a PCR application.  In a subsequent motion seeking to replace Gerber with alternative counsel, Gottlieb referred to his December 15, 2000 Letter as simply a "letter memorandum and subsequent addendums."  (ECF No. 15-16 at ECF p. 4).  Gottlieb also expressed worries about potential time bars for seeking relief in letters he sent the state courts during the spring of 2001, thus indicating that he did not consider any prior filing to be a PCR application.  (*See* ECF Nos. 15-18 & 15-20).  Judge Ashrafi, in denying the motion for new counsel, referred to Gottlieb's "*anticipated* first post-conviction relief petition" (emphasis added) and urged Gottlieb and Gerber to "make further efforts to work cooperatively toward the filing of the petition."  (ECF No. 15-21.)  Lastly, Gottlieb finally filed a proper PCR petition in December 2002, and it is this date that he identifies as the commencement of his PCR proceedings in the habeas petition presently before this Court.  (*See* ECF No. 1 ¶ 11.)  Accordingly, the Court considers Gottlieb's December 2002

---

disposition, and concerning any appeal therefrom, together with copies of opinions therein, trial and appellate; (e) whether petitioner was represented by counsel in any of the proceedings aforementioned, naming the counsel in each such proceeding, and stating whether counsel was in each instance retained or assigned; (f) whether and where defendant is presently confined.

R. 3:22-8 (2000).

petition to be the only properly filed PCR application in this matter and denies his request to find AEDPA statutory tolling beginning December 15, 2000.

### 2. Equitable Tolling of the AEDPA Limitations Period

Gottlieb next argues that Gerber's failure to aid in filing a PCR petition justifies equitably tolling the AEDPA limitations period.  The Supreme Court established, in *Holland v. Florida*, 560 U.S. 631, that the AEDPA limitations period may be equitably tolled and, further, that attorney malfeasance may warrant such equitable tolling.  *Id.* at 645–54.  Equitable tolling will be granted only if a petitioner can demonstrate "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."  *Id.* at 649 (quoting *Pace*, 544 U.S. at 418); *see also Ross*, 712 F.3d at 798; *Jenkins*, 705 F.3d at 89.  The *Holland* Court emphasized that such determinations, as equitable in nature, should be fact specific and rendered on a case-by-case basis.  *See Holland*, 560 U.S. at 649-50; *see also Ross*, 712 F.3d at 799.

The *Holland* Court rejected a holding by the Court of Appeals for the Eleventh Circuit that found attorney misbehavior could constitute an extraordinary circumstance for the purpose of equitable tolling *only* if it involved allegations of "'bad faith, dishonesty, divided loyalty, mental impairment or so forth.'"  *Holland*, 560 U.S. at 644, 651–52 (quoting *Holland v. Florida*, 539 F.3d 1334, 1339 (11th Cir. 2008)).  Nonetheless, it reaffirmed that equitable tolling would be appropriate only in the face of extraordinary circumstances and, thus, that "garden variety" attorney negligence does not provide sufficient justification.  *Id.* at 651–52; *see also Jenkins*, 705 F.3d at 89 n.16.  Applying these findings, the *Holland* Court found the potential for a showing of extraordinary circumstances because Holland's attorney failed to timely file a petition "despite Holland's many letters that repeatedly emphasized the importance of his doing so," failed to

research the proper filing date although Holland had identified the applicable rules for him, failed to promptly inform Holland that the Florida Supreme Court had ruled in his case despite Holland's requests for that information, and "failed to communicate with his client over a period of years, despite various pleas from Holland that [counsel] respond to his letters."[6]  *Holland*, 560 U.S. at 652.

Addressing the diligence prong, the *Holland* Court found that a showing for equitable tolling requires only reasonable diligence, "not maximum feasible diligence."  *Holland*, 560 U.S. at 653; *see also Ross*, 712 F.3d at 799.  The Third Circuit has noted that a petitioner must exercise diligence throughout the process of exhausting state court remedies, not only in filing a habeas petition.  *Ross*, 712 F.3d at 799.  Although the diligence test is applied subjectively, it is still applied to litigants proceeding *pro se*—a petitioner's "lack of legal knowledge or legal training does not alone justify equitable tolling."  *Id.* at 799–800.

Additionally, the Third Circuit has required that litigants seeking equitable tolling show that an attorney's extraordinary misconduct *caused* the default in timeliness.  *Id.* at 803.  In other words, the extraordinary circumstances "must somehow have affected the petitioner's ability to file a timely habeas petition."  *See Nara v. Frank*, 264 F.3d 310, 320 (3d Cir. 2001), *abrogated on other grounds by Carey v. Saffold*, 536 U.S. 214 (2002).

In this case, Gottlieb argues that Gerber's conduct warrants equitable tolling of his AEDPA limitations period.  (ECF No. 16 at 5–12.)  He contends that Gerber almost immediately destroyed the attorney-client relationship by writing Gottlieb that he had conducted a short

---

[6]  The *Holland* Court declined to conclude that the conduct by Holland's attorney established extraordinary circumstances for the purposes of equitable tolling, as the District Court had not ruled on this issue.  *Holland*, 560 U.S. at 653–54.  The District Court apparently later found tolling to be appropriate and addressed Holland's petition on its merits.  *See Holland v. Tucker*, 854 F. Supp. 2d 1229 (S.D. Fla. 2012).

review of the case file, while Gottlieb contends that a "short review" of the 30,000-page case file would be impossible, and by directing Gottlieb to send his communications directly to the courts. (*Id.* at 6–8.)  Gottlieb asserts that, contrary to Gerber's suggestion, he had already identified PCR issues to raise, particularly the alleged *Apprendi* violation.  (*Id.* at 9–10.)  Accordingly, he concludes that Gerber was not working in his best interests, but was instead an obstacle to his PCR filing.  (*Id.* at 10–11).  Gottlieb additionally alleges that he faced extraordinary circumstances in that the state courts require that a PCR petition state the underlying facts with specificity, yet he was deprived access to the legal records and the New Jersey legal materials he needed to do this.  (*Id.* at 11–12.)  Gottlieb contends that his unique circumstances amount to an extraordinary circumstance for the purpose of equitable tolling.  (*Id.* at 12.)

Respondents, meanwhile, argue that extraordinary circumstances generally exist only when an attorney has essentially abandoned a client.  (ECF No. 15 at 5–9.)  They contend that Gottlieb and Gerber's correspondence during the AEDPA limitations period shows that Gerber was willing to work with him in submitting a timely PCR petition, but that Gottlieb failed to take the action needed to advance the proceeding.  (*Id.* at 10–34.)  Respondents assert that Gottlieb's difficulties accessing trial transcripts and New Jersey legal materials from his Indiana prison do not rise to the level of an extraordinary circumstance.  (*Id.* at 34–36.)  Even if Gottlieb could demonstrate extraordinary circumstances, Respondents assert that he still could not show that he acted with the reasonable diligence required for equitable tolling.  (*Id.* at 9–34.)  They argue that Gerber's July 25, 2001 letter gave Gottlieb explicit notice that Gerber did not understand Gottlieb to have directed him to file a PCR petition, thus concluding that Gottlieb "could have easily filed at least a basic pro se petition before the October 5, 2001 deadline, and the fact that he waited until over 14 additional months had passed beyond that deadline before filing a pro se

petition in mid-December 2002 does not demonstrate reasonable diligence." (*Id.* at 35; ECF No. 18 at 10–14.)

Gottlieb contends that his diligence is amply demonstrated by his rapid efforts to retain PCR counsel following denial of certification upon direct appeal by the Supreme Court of New Jersey. (ECF No. 16 at 6.) Gottlieb asserts that it was Gerber's failure to provide him discovery and transcripts that prevented him from drafting his own PCR petition. (*Id.* at 10.)

Respondents, in turn, allege that Gottlieb's arguments that incarceration in Indiana and lack of access to legal materials prevented him from filing a *pro se* PCR petition are refuted by the fact that he was still incarcerated there when he finally did file his petition in December 2002. (ECF No. 18 at 12–13.)

A review of cases from within this Circuit suggests that equitable tolling on the basis of attorney malfeasance is rarely granted and is appropriate only in response to particularly egregious circumstances. In *Ross v. Varano*, 712 F.3d 784, the Third Circuit affirmed the application of equitable tolling based on the petitioner's "attorney missing deadlines for filing documents with the state courts, the attorney's failure to communicate with Ross, and the attorney's misleading statements when he did communicate with Ross," as well as "Ross's mental health issues, limited education, and limited cognitive ability." *Id.* at 788. More particularly, the Court noted that Ross's attorney, during a course of over seven years, would not respond to his letters for months at a time, *id.* at 789–90, assured Ross that his appeal was progressing, but then withdrew the appeal in order to file a PCR petition, *id.* at 790–91, did not tell Ross the appeal was withdrawn and never in fact filed a PCR petition, *id.* at 791, falsely suggested to Ross that the state courts had lost his case file, *id.*, and assured Ross that he would file a *nunc pro tunc* appeal within a few weeks, but never did, *id.* at 791–92. The Court observed

that "'the proper inquiry is *not how unusual the circumstance* alleged to warrant tolling is among the universe of prisoners, . . . *but rather how severe an obstacle it is for the prisoner* endeavoring to comply with AEDPA's limitations period.'"  *Id.* at 802–03 (omission in original) (quoting *Pabon v. Mahanoy*, 654 F.3d 385, 400 (3d Cir. 2011)).  It found equitable tolling appropriate in the totality of the circumstances, namely, the attorney's "misleading statements on matters that should have been within [his] knowledge, the Common Pleas Court's no doubt unintentionally misleading statement implying that [the attorney] was prosecuting Ross's appeal, [the attorney's] unresponsiveness and neglect of the case, and Ross's limited abilities."  *Id.* at 803.

Although not addressing the AEDPA limitations period, the Third Circuit's opinion in *Seitzinger v. Reading Hospital and Medical Center*, 165 F.3d 236 (3d Cir. 1999), presents one of the few other cases in which the Third Circuit has approved of equitable tolling on the basis of attorney malfeasance.  *See id.*  The *Seitzinger* Court reversed a denial of equitable tolling where Seitzinger's attorney told her he had filed a complaint when he had not, ignored Seitzinger's calls, and finally told Seitzinger to check with the court regarding her case because he was giving up his law practice (he had in fact been suspended from the practice of law).  *Id.* at 238, 241. The Court concluded that the attorney's "misbehavior went well beyond the garden variety, because [the attorney] affirmatively lied to his client," particularly about whether he had filed a complaint.[7]  *Id.* at 241.

---

[7]  One of the few other Third Circuit cases to effectively approve of a grant of equitable tolling is *Ragan v. Horn*, 411 F. App'x 491 (3d Cir. 2011).  There, the Third Circuit overturned the District Court's revocation of a prior grant of equitable tolling (due to its perception that plaintiff had failed to exercise due diligence in meeting a new, court-imposed deadline).  *Id.*  Ragan's attorney had established a pattern of regular communication and prompt notification of case developments with Ragan and his family, but then, inexplicably, failed to file a habeas petition though he said he would.  *See Ragan v. Horn*, 538 F. Supp. 2d 906, 909–10 (E.D. Pa. 2008).  The District Court stressed the "culture of reliance" that Ragan's attorney created with his initial responsiveness and that he subsequently "covertly changed the rules in the middle of the game."  *Id.* at 913–14.  Notably, the grant of equitable tolling seems to have been partially based upon a

By contrast, there are a number of relevant decisions denying equitable tolling based on attorney malfeasance.  Equitable tolling has been denied in cases where the client should have discovered that his attorney had not filed a complaint when the attorney had represented that he/she would, and before the limitations period had run, *Schlueter v. Varner*, 384 F.3d 69, 76 (3d Cir. 2004), where the attorney was "forthright" with his client about his intent not to file an appeal, *Brown v. Shannon*, 322 F.3d 768, 773–74 (3d Cir. 2003), where the attorney failed to inform his client he was no longer representing her, but she discovered the attorney had not filed an appeal with three months remaining in which to file a timely habeas petition, *Cristin v. Wolfe*, 168 F. App'x 508, 512 (3d Cir. 2006), where the attorney's alleged statement to the client that all appeal rights were waived resulted in a failure to seek collateral relief, *Markus v. United States*, Civ. A. No. 15-7545 (JLL), 2015 WL 8490959, at *4 (D.N.J. Dec. 10, 2015), and where the attorney told his client the wrong deadline for filing a habeas petition, *Garcia v. Bartkowski*, Civ. A. No. 11-3689 (DRD), 2015 WL 857737, at *8–9 (D.N.J. Feb. 27, 2015).  Courts have also refused to apply equitable tolling when a plaintiff fails to exercise reasonable diligence, particularly when the plaintiff did not adequately inform himself regarding the proceedings.  *See, e.g.*, *Ohler v. Lamas*, 542 F. App'x 205, 207 (3d Cir. 2013) (petitioner "waited nearly two years with little or no communication from counsel before contacting the Court" (internal quotation marks omitted)); *United States v. Bass*, 268 F. App'x 196, 200 (3d Cir. 2008) (noting that petitioner's "attempts to determine the status of his case were sporadic at best"); *Martin v. D'Ilio*, Civ. A. No. 15-7158 (JBS), 2017 WL 1003246, at *4 (D.N.J. Mar. 15, 2017) (petitioner waited seven years to contact court despite attorney's failure to respond to communications).

---

more lenient standard applied to habeas petitioners facing capital punishment.  *See id.* at 914–15; *see also McClain v. Warren*, Civ. A. No. 11-7093 (SDW), 2014 WL 2805112, at *5 (D.N.J. June 20, 2014).

Here, the Court does not find equitable tolling justified. While Gerber refused to aid Gottlieb in drafting the certain substantive portions of a PCR petition, the Court cannot conclude that attorney's conduct in that regard constituted an extraordinary circumstance—that is, a severe obstacle to the filing of a PCR petition by Gottlieb, within the AEDPA limitations period. *See Ross*, 712 F.3d at 802–03. Indeed, counsel was generally prompt and forthright in his communications with Gottlieb. *See Brown*, 322 F.3d at 773–74. There is no indication that Gerber affirmatively misled Gottlieb or failed to inform him of crucial information. *See Holland*, 560 U.S. at 652; *Ross*, 712 F.3d at 803. Nor did Gerber make any misrepresentations to the court regarding the attorney-client relationship. In fact, Gerber apprised the court regarding the breakdown of his relationship with Gottlieb.

Furthermore, even if the facts Gottlieb alleges did constitute extraordinary circumstances, he fails to show that they caused his failure to file a PCR petition in time to toll the AEDPA limitations period. Gottlieb contends that his incarceration in Indiana, where he had no access to his own trial records or New Jersey legal materials, prevented him from drafting a *pro se* PCR petition. That alleged causal nexus is call into question, however, by the fact that Gottlieb was still confined in Indiana when he eventually filed his PCR petition in December 2002. Similarly, Gottlieb does not establish how Gerber's refusal to draft a PCR petition on his behalf thwarted him from timely filing a *pro se* petition. By no later than early August of 2001, Gottlieb should have understood that Gerber did not plan on drafting a petition for him. (*See* ECF No. 15-22.) Although Gottlieb then had, for AEDPA-tolling purposes, approximately two months to draft and file a basic PCR petition, and despite demonstrating an awareness that the timing of his filing of a PCR petition also implicated his federal habeas deadline, (*see* ECF No. 15-18), Gottlieb did not in fact submit his *pro se* PCR petition until almost a year and a half later. While

Gottlieb contends that his prompt and repeated efforts to obtain substituted counsel demonstrated diligence, his diligence was lacking when he failed to submit a petition.

More importantly, even if the Court found that Gerber's conduct warranted equitable tolling, it still appears that Gottlieb's habeas petition would be untimely under AEDPA. Gerber submitted a letter, dated September 5, 2001, to Judge Ashrafi, copying Gottlieb, that again made clear that he would not be drafting a PCR petition. Gottlieb was on notice then that Gerber would not file a petition on his behalf. After that time, no party has given any indication of subsequent communication between Gottlieb and Gerber. Furthermore, there is no indication that Gottlieb received relevant documents or that any other material circumstance changed between September 2001 and December 2002. Thus, even if the one-year AEDPA limitations period was tolled until September 5, 2001 (and there does not seem to be any argument for extending it up to, much less beyond, that date), it still would have expired before Gottlieb filed his petition in December 2002. *See Johnson v. Hastings*, Civ. No. 13-305 (KM), 2014 WL 5159969, at *4–5 (D.N.J. Oct. 10, 2014) ("Johnson and his family were allegedly unable to contact [his attorney] for 11 months . . . , however, even if this 11 month period is equitably tolled, the habeas petition remains untimely.").

Accordingly, an application of equitable tolling is not warranted in this case, and Gottlieb's petition is untimely under the general AEDPA limitations period.

### 3. Actual Innocence

The Supreme Court established in *McQuiggin v. Perkins*, 569 U.S. 383, that a habeas petitioner may use a convincing showing of actual innocence as a gateway to advance a habeas claim that would otherwise be untimely under AEDPA, regardless of whether the petitioner exercised reasonable diligence under *Holland*. *See id.* at 386–87, 391–401. An actual-innocence

argument falls under the narrow equitable exception to AEDPA permitting courts to address a potential fundamental miscarriage of justice.  *See Satterfield v. Dist. Att'y Phila.*, 872 F.3d 152, 162 (3d Cir. 2017); *Coleman v. Superintendent Greene SCI*, 845 F.3d 73, 76 (3d Cir. 2017).  The standard for an actual innocence showing is demanding, and a petitioner must "present[] 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *McQuiggin*, 569 U.S. at 401 (quoting *Schlup v. Delo*, 513 U.S. 298, 316 (1995)).

Accordingly, a petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327.  In this way, it is not a question of whether the Court itself would find that the petitioner is actually innocent, but a prediction of whether a reasonable juror would not have been able to find the petitioner guilty.  *Id.* at 329; *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 184 (3d Cir. 2017). Making such a showing requires that the petitioner present new evidence, not available prior to the conviction, that is reliable, "'whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'"  *Hubbard v. Pinchak*, 378 F.3d 333, 339–40 (3d Cir. 2004) (quoting *Schlup*, 513 U.S. at 324).  Actual innocence presents an exceedingly high bar, and most such claims are rejected.  *See Schlup*, 513 U.S. at 324; *Hubbard*, 378 F.3d at 341.

Gottlieb asserts that numerous pieces of evidence demonstrate his actual innocence. (ECF No. 16 at 13–41.)  Overall, he contends that this evidence is new, reliable, and that, given its presentation, no reasonable juror would have convicted him.  (*Id.* at 40–41.)  He urges that he was unaware of the bulk of this evidence prior to 2004, when he returned to New Jersey.  (*Id.* at 40.)  He further alleges that most of the evidence is documentary, and that it conclusively

demonstrates that Brenda Wolf actively participated in an insurance-fraud scheme to stage the robbery.  (*Id.* at 41.)

Gottlieb's primary argument is that the evidence demonstrates that Brenda Wolf was not shot while Jeffrey Wolf and Gottlieb's alleged co-conspirator Kennon struggled over the gun, but instead that Jeffrey Wolf shot Kennon and then, several minutes later, intentionally shot Brenda Wolf.  (*See id.* at 16–41.)  Gottlieb contends that this circumstance would prove that Brenda Wolf was complicit in a plot of insurance fraud, because after Jeffrey Wolf shot Kennon she was helping to stage the robbery instead of calling the police.  (*Id.*)  Proof that Brenda Wolf was complicit in a scheme of insurance fraud with Gottlieb and his associates would, Gottlieb asserts, negate the requisite intent element for his conviction for the robbery of Brenda Wolf.  (*Id.*)  Gottlieb asserts that the evidence supports this theory, and the Court reviews each of the evidence, in turn.

### a.  *Circumstances of Kennon's Shooting*

Gottlieb contends that, after he returned to New Jersey in 2004, he learned that Kennon gave false testimony at his (Gottlieb's) trial.  (*Id.* at 15–17.)  Gottlieb submits a certification from Kennon, in which Kennon states that he did not receive his own medical reports until after his trial was complete (though prior to Gottlieb's trial), and that the content of those reports changed his perception of the shooting.  (Br. in Opp'n, ECF No. 16-1, Ex. 21, at 2 (ECF p. 127).)  Specifically Kennon claims that, while in pretrial statements he stated that he was shot three times and the first shot was in the front of the shoulder, his medical records revealed that he had been shot five times and first in the rear of the shoulder.  (*Id.*)  Kennon states that at Gottlieb's trial, he initially testified as he believed to be consistent with the medical records, but then his attorney, in conjunction with the State, pressured him, at threat of abandoning his plea

agreement, into returning to the courtroom and testifying that he was shot only three times.  (*Id.* at 2–4 (ECF pp. 127–29).)  Kennon further states that he initially testified that he had not struggled with Jeffrey Wolf, but then, when he retook the stand, testified that he had, "even though I no longer believed it to be the truth."  (*Id.* at 4 (ECF p. 129).)  Kennon recounts that, once Gottlieb was transferred to New Jersey in 2004, he worked out a deal with Gottlieb whereby Kennon would give Gottlieb trial materials he had, and, in return, Gottlieb would give Kennon any expert reports he obtained.  (*Id.* at 4–5 (ECF pp. 129–30).)

Respondents urge that post-trial recantations by Kennon, who is now affirmatively aiding Mr. Gottlieb, are inherently unreliable.  (ECF No. 18 at 18–19.)

The Court agrees with Respondents that Kennon's new certification cannot be interpreted as reliable evidence or as a "trustworthy eyewitness account."  *See Schlup*, 513 U.S. at 324. First, Kennon clearly has an interest in exculpating Gottlieb, as he indicates that they have agreed to work together to help with each other's efforts to overturn their convictions. Furthermore, accepting Kennon's new certification as true would mean accepting a statement that he previously perjured himself in order to minimize his own punishment.  The circumstances make clear that Kennon either lied during Gottlieb's trial or is lying now, but either conclusion reveals his statements as inherently untrustworthy.

b.  *Diagnostic and Expert Evidence Concerning the Number and Range of Bullets Fired During the Crime*

Gottlieb further argues that Kennon's testimony at Gottlieb's trial that he was shot "three or four times" and at close range is refuted by FBI diagnostics and medical records, which indicate that Kennon was shot five times and not at close range.  (ECF No. 16 at 15–17.)  In support of this, Gottlieb includes a report from the FBI Laboratory dated January 29, 1996

(apparently created for Kennon's trial), which notes that an "absence of specific gunpowder residue patters around [holes in Kennon's jacket] precludes the possibility of making any muzzle-to-garment determinations."  (ECF No. 16-1, Ex. 3, at 7 (ECF p. 18).)

Regarding the number of shots fired, Gottlieb includes a report from a radiologist, Dr. Berg, dated February 5, 2010 (apparently produced for Kennon's PCR proceeding), who opines that x-rays and CT scans taken of Kennon on March 14, 1995, indicate that fragments of four bullets were in Kennon's body at that time and that subsequent medical records show Kennon was shot five times.  (ECF No. 16-1, Ex. 4 (ECF pp. 21–22).)  Gottlieb also includes copies of two x-rays of Kennon.  (ECF No. 16-1, Ex. 5 (ECF pp. 25–29).)  The accompanying medical authorizations indicate that these x-rays are from Kennon's treatment between March 14 and 16, 1995.  (*Id.*)

Gottlieb contends that Dr. Berg's report, in conjunction with a report and testimony of Corporal Joseph Kucich (who appears to be the State's ballistics expert) from Kennon's trial, indicate that at least seven bullets were fired, although Jeffrey Wolf's gun was only a six-shot revolver.  (ECF No. 16 at 18–20.)  The report of Corporal Kucich, dated March 16, 1995, indicates that one bullet was recovered from Brenda Wolf and "additional" bullets were recovered from Kennon.  (*See* ECF No. 16-1, Ex. 6 (ECF pp. 30–34.  An excerpted transcript from Kennon's trial reflects that Corporal Kucich testified that, given the number of fragments he had received for analysis, he would "speculat[e]" that he had pieces of five bullets.  (ECF No. 16-1, Ex. 7, at 56 (ECF p. 41).)  Gottlieb also included testimony from the Kennon trial by an investigating officer who stated that the hospital did not immediately remove all bullets from Kennon and that he believed that x-rays indicated that two bullets remained in Kennon.  (*Id.* at 78 (ECF p. 42).)

Gottlieb additionally introduces a report dated January 25, 2011 by Dr. James E. Hamby, a firearm and toolmark expert, who, "at Mr. Gottlieb's request," provided a video recording of various tests involving a gun similar to the gun fired during the crime, in order "to depict the effects." (*See* ECF No. 16-1, Ex. 14 (ECF pp. 83–85).)  Dr. Hamby's report states, "I reviewed a variety of transcripts and laboratory reports and would opine that it would be necessary to physically review the shooting evidence to make any specific determinations concerning the number of bullets fired from the evidence revolver." (*Id.*)  Dr. Hamby offers to conduct such a review if the evidence is sent to him. (*Id.*)

Respondents assert that arguments regarding gunpowder residue on Kennon's shirt were raised at trial and, in any case, that the FBI report does not establish that Kennon was not shot at close range. (ECF No. 18 at 16–18; *see also* Reply Br. in Supp., Ex. 28, Trial Transcript *State v. Gottlieb*, Oct. 23, 1997, ECF No. 19-5, at 31–33 (ECF pp. 10–11). They also urge that Kennon presented the same arguments and evidence regarding the number of bullets fired during both direct and PCR proceedings with no success, because such evidence was not directly relevant and because it was impossible to determine the actual number of bullets fired. (ECF No. 18 at 21–25.)  Respondents note that these arguments were similarly unsuccessful when presented during Mr. Gottlieb's PCR proceeding. (*Id.* at 25–26.)  These rejections, Respondents note, were under the prejudice prong required to establish ineffective assistance of counsel, whereas a showing of actual innocence presents a more difficult burden. (*Id.* at 26–27.)  Respondents urge that the PCR court rejected the Hamby report as inadmissible, as Dr. Hamby did not indicate any degree of scientific certainty, and, in any case, that the certification could not show that Brenda Wolf was complicit with the robbery. (*Id.* at 37–38.)

First, the trial transcript makes clear not only that evidence regarding residue on Kennon's shirt was available during Gottlieb's trial, but that it was in fact raised at trial, and does not constitute new evidence that would lead any reasonable juror to acquit.  While Dr. Berg's report concerning the number of times Kennon was shot was not available during Gottlieb's trial, all the factual evidence to produce that report was, and it is not clear that anything in support of this argument may be classified as evidence that was not available at trial.  *See Hubbard*, 378 F.3d at 339–40.  In any event, most of this evidence is highly speculative:  Dr. Berg states that Kennon's wounds "*suggest* that a total of five bullets entered [Kennon's] body" (emphasis added), (ECF No. 16-1, Ex. 4);  Corporal Kucich, "[n]aturally speculating," said he had examined five bullets, (ECF No. 16-1, Ex. 7 at 56); Dr. Hamby, quite understandably, stated that he could not make any specific determinations without actually examining the evidence, (ECF No. 16-1, Ex. 14).

Even if this evidence could be considered reliable, it in no way seems to clearly establish that more than six shots were fired.  The x-rays and scans of Kennon that Dr. Berg relied upon were taken on March 14, 1995—the day of the crime—whereas Corporal Kucich's report from two days later indicates that he examined the bullets that were recovered from Kennon.  That fact alone seems to suggest that simply adding together the number of bullets referenced in Dr. Berg's report and Corporal Kucich's report and testimony cannot reveal any conclusive total.  In any case, even if pieces of two bullets remain in Kennon's body and pieces of five bullets exist outside Kennon's body, this does not mean that the fragments are mutually exclusive.  If, for example, half of a single bullet permanently lodged in Kennon's body and the other half passed through (or were removed), then Dr. Berg's report may reflect one half and Corporal Kucich's the other, but this does not convert one bullet to two.  All in all, this evidence is insufficient to

reach any conclusion regarding the number of bullets fired, much less to show that a reasonable juror could not conclude that six or fewer bullets were fired.

c. *Missing Testimony from Other Witnesses*

Gottlieb further alleges that the prosecution concealed witnesses Mary Rogers and Michael Horgan, as well as Corporal Kucich, thus preventing them from testifying at his trial. (ECF No. 16 at 30–35.)  He introduces excerpts of their testimony from Kennon's trial.  Rogers, a registered nurse who happened to be in the hair salon next door to the jewelry store at the time of the crime, testified that she heard two or three shots and shortly thereafter another four or five shots.  (ECF No. 16-1, Ex. 15, at 28–29 (ECF pp. 89–90).)  She recounted that, when she went to try to help Brenda Wolf, she told Jeffrey Wolf to call 911, as no ambulance or police had yet arrived.  (*Id.* at 33 (ECF p. 91).)  Gottlieb contends that Rogers's testimony both shows that more than six shots were fired and suggests that Jeffrey Wolf waited to call 911 until he knew Brenda Wolf was dead.  (ECF No. 16 at 30–32.)

Gottlieb also introduces a statement by Michael Horgan, dated April 24, 1995, who recounted that, around the time of the crime, he saw a man with a gun speaking with another man in a green coat in the parking lot outside the store, and that the second man then left.  (ECF No. 16-1, Ex. 16 (ECF pp. 94–97).)  Gottlieb urges that this testimony refutes Jeffrey Wolf's testimony that immediately after the shooting he ran to Brenda, triggered the alarm, and called 911.  (ECF No. 16 at 34–45.)  Corporal Kucich's testimony during Kennon's trial has already been described herein.

Respondents argue that Rogers's testimony was available at the time of Gottlieb's trial, given that she testified during Kennon's trial, and that, regardless, it does little to support his actual-innocence theory.  (ECF No. 18 at 38–41.)  They assert that Gottlieb's theory that Jeffrey

33

Wolf delayed calling 911 is refuted by the records that show that his 911 call was among six or seven others, all of which were made within a period of 57 seconds. (*Id.* at 41.) Respondents contend that Horgan's statement contributes little to any assessment of the underlying events. (*Id.* at 41–44.)

As with much of the other evidence Gottlieb seeks to rely upon in proving his innocence, there is no showing that this testimony was unavailable to Gottlieb at the time of his trial. Even if it could be considered new evidence, however, Rogers's testimony is just as consistent with six shots being fired as with eight, and any indication that Jeffrey Wolf may have failed to promptly call 911 does not conclusively establish his complicity in the crime, much less Brenda Wolf's. While Horgan's testimony could potentially have cast some doubt on Jeffrey Wolf's version of events, it is insufficient to prove Gottlieb's actual innocence on this motion.

### d. Evidence Regarding the State of the Wolfs' Marriage and Business

Gottlieb further argues that Brenda Wolf's family believes that Jeffrey Wolf intentionally killed her, but that prosecutors ignored their communications regarding this fact. (ECF No. 16 at 20–22.) He introduces the certification of Brenda Wolf's sister, Laura Trueman, dated February 1, 2011, who states that she and her parents suspected since early in the investigation that Jeffrey Wolf had been involved in the crime. (ECF No. 16-1, Ex. 8 (ECF pp. 44–47).) Trueman contends that Jeffrey Wolf typically video-recorded what happened in the store, but that on the day of the crime there was no tape in the recorder. (*Id.*) Trueman also states that Brenda Wolf controlled the store's finances and that she would not have left $30,000 in the store safe except for a specific purpose. (*Id.*) She alleges that Brenda and Jeffrey Wolf had a strained marriage, and accuses her other sister, Cynthia Sandow, of lying at trial by characterizing the marriage as a

good one.  (*Id.*)  Finally, she recounts that Jeffrey Wolf was an "expert marksman" and owned

many guns.  (*Id.*)

Gottlieb also alleges that Sandow subsequently admitted to perjury during his and

Kennon's trials, and that she admitted that she and her husband had participated with the Wolfs

in a scheme to traffic stolen property.  (ECF No. 16 at 22–23.)  In support, Gottlieb introduces

letters to Kennon from his attorney, which recount unsuccessful efforts by Trueman to get the

full facts from Sandow.  (ECF No. 16-1, Ex. 9 (ECF pp. 49–52).)  Kennon's attorney primarily

indicated that Sandow had admitted that she and her husband engaged in selling stolen jewelry to

Jeffrey Wolf.  (*See id.*)  Gottlieb speculates that the Somerset County Prosecutor's Office, when

it discovered Sandow was contemplating releasing further information, intimidated her into

remaining quiet.  (*Id.*)

Gottlieb further alleges that the Wolfs were engaged in tax fraud from 1992 to 1995, and

maintained improper business records, thus suggesting their propensity for crime.  (ECF No. 16

at 24–26, 28–29.)  In support of this, he submits their business income tax returns for 1992

through 1995.  (ECF No. 16-1, Ex. 10 (ECF pp. 54–57).)  Gottlieb also includes a certification

from accountant David H. Glusman, dated February 2, 2011, who opines "that the accounting

records as produced at the trial do not constitute a full set of accounting records for a jewelry

store" and that not all transactions are accounted for.  (ECF No. 16-1, Ex. 12 (ECF pp. 60–63).)

Gottlieb contends that this evidence supports his argument that the Wolfs asked him to

participate in their insurance fraud scheme because he had previously sold them stolen goods.

(ECF No. 16 at 26.)

Respondents urge that the additional evidence supplied by Trueman may not be treated as

reliable, as she has been actively working on Kennon's behalf.  (ECF No. 18 at 27–29.)  In any

case, Respondents contend that Trueman's alleged claims would, at most, serve to potentially impeach tangential testimony given by Jeffrey Wolf, and do not support a showing of actual innocence.  (*Id.* at 29–32.)  Respondents further argue that other hearsay evidence related to Kennon's PCR proceeding, the Wolf's tax returns, and Glusman's opinion that the Wolfs' financial information was incomplete do not constitute reliable evidence or demonstrate anything related to Mr. Gottlieb's alleged innocence.  (*Id.* at 32–35.)

Once again, this highly speculative evidence falls far short of making a showing of actual innocence.  Even a conclusive showing that the Wolfs had been involved in buying and selling stolen goods or that they had an unhappy marriage would not preclude a reasonable juror from finding that Gottlieb had robbed Brenda Wolf.  If this sort of testimony had been presented at Gottlieb's trial (and there is little indication that the facts underlying these opinions, other than Sandow's supposed confession to perjury, were unavailable at that time), it may well have worked in Gottlieb's favor, but it is doubtful that any reasonable juror would have had to find Gottlieb innocent based on this evidence.

e.  *Existence of Insurance Policies Covering Brenda Wolf's Death*

Gottlieb contends that, contrary to the testimony at his trial, records show that the Wolfs had several insurance policies with death benefits, and that Jeffrey Wolf subsequently filed suit to obtain these benefits.  (ECF No. 16 at 26–28.)  Gottlieb introduces documents regarding an insurance policy covering the Wolfs' business (Jeffrey Scott Jewelers), which indicates coverage for loss of income and personal injury, among many other provisions, as well as a complaint that Jeffrey Wolf filed against the insurer in October 1997 seeking coverage for defense and indemnity in a wrongful-death civil suit that Brenda Wolf's family commenced.  (ECF No. 16-1, Ex. 13 (ECF pp. 65–81).)

Respondents properly note that this is not the same as a life insurance policy and that Jeffrey Wolf's suit against the insurer did not seek benefits accruing from Brenda Wolf's death. (ECF No. 18 at 35–36.)  I find that this evidence does nothing to prove his actual innocence.

### f.   Tampering with Brenda Wolf's Fingerprints

Gottlieb also alleges the existence of a scheme to conceal the fact that Brenda Wolf's fingerprints or palm-prints may have been on items strewn about the crime scene, which he contends would have shown that she was complicit in the robbery.  (ECF No. 16 at 36–39.)

Respondents urge that fingerprint testimony was all put before the jury, who still convicted Gottlieb.  (ECF No. 18 at 44–46.)

Not only was this evidence clearly available during and presented at Gottlieb's trial, but it is entirely unclear what significant role it would play in the trial when it is unremarkable that Brenda Wolf's fingerprints were on items in the store where she worked on a daily basis. Indeed, Gottlieb does little to make that connection.  Therefore, I find that this evidence provides no support for Gottlieb's actual-innocence.

### g.   Cumulative Evidence

Even if each item of evidence that Gottlieb has introduced were found to be both new and reliable, the cumulative impact would still not satisfy the burden set forth by the Supreme Court in *McQuiggin* and *Schlup*.  Accepting Gottlieb's theories to conclude that Jeffrey Wolf in fact did reload his gun and intentionally kill Brenda Wolf, that the Wolfs had an unhappy marriage, or that they used the store to fence stolen jewelry, these conclusions are simply too attenuated to show that Gottlieb did not in fact rob Brenda Wolf.  They could support (though hardly render irrefutable) a conclusion that Jeffrey Wolf intentionally killed Brenda Wolf.  But Gottlieb was acquitted of the felony-murder charge.  These arguments, even if accepted at face value, fall far

short of demonstrating that no reasonable juror could find that Gottlieb had intent to rob Brenda Wolf.  Accordingly, Gottlieb's attempt to use the actual-innocence gateway to avoid the effect of his petition's untimeliness must fail.

### 4.  Newly Discovered Evidence

Gottlieb urges that he did not have the discovery necessary to raise various grounds for relief until significantly after the normal AEDPA limitations period, thus justifying a relaxation of the applicable time bar.  (ECF No. 16 at 43–44.)  Specifically, Gottlieb argues that he did not have complete access to discovery during his trial and that Gerber failed to send Gottlieb any materials while Gottlieb was incarcerated in Indiana.  (*Id.*)  Essentially he contends that the materials he obtained from Kennon in 2004 and materials he received from a subsequent PCR attorney between 2005 and 2011 should be treated as newly discovered evidence.  (*Id.*)

Respondents argue that this evidence could have been discovered with due diligence and that the PCR court already found that Gottlieb had access to all documents from all co-conspirator trials since they occurred.  (ECF No. 18 at 47–51.)

A newly discovered factual basis for a habeas petition may restart the AEDPA limitations period from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D); *see also McQuiggin*, 569 U.S. at 388–89.  Gottlieb's conclusory assertion that, while his counsel had access to full discovery during his trial and subsequent proceedings, he personally did not is insufficient to make such a showing.  Gottlieb's counsel, acting as his agent, had access to these materials, and thus, they were discoverable.

### 5.  Fundamental Fairness

Finally, Gottlieb asserts that the fact the SCPO did not assert the time-bar against Kennon's habeas proceeding indicates part of the conspiracy to cover up the insurance-fraud scheme by the Wolfs.  (ECF No. 16 at 45–46.)  Gottlieb essentially contends that Respondents' efforts to thwart his attempts to challenge his conviction mean that "[f]undamental fairness demands that Petitioner be given the right to advance his claims."  (ECF No. 16 at 45–46.)  Gottlieb's argument is entirely conclusory and the Court is unaware of any precedent for granting relief on such grounds.  Accordingly, this argument is rejected.

As Gottlieb's petition is untimely under AEDPA and he has failed to establish statutory tolling, equitable tolling, or an actual-innocence exception to the time-bar, it will be dismissed with prejudice as untimely.

## VII.   THE STAY MOTION

The Court sees no basis to stay this proceeding for further pursuit of relief from the state courts.  *See Rhines v. Weber*, 544 U.S. 269, 275–78 (2005).  In any case, as the petition is now dismissed, Gottlieb's motion to stay the proceeding has been rendered moot.

## VIII.   CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), a litigant may not appeal a final order in a § 2254 habeas proceeding unless the judge or a circuit justice issues a certificate of appealability ("COA").  That section further directs courts to issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, reasonable jurists would not find the Court's procedural ruling debatable. Accordingly, no certificate of appealability shall issue.

## IX.    CONCLUSION

For the foregoing reasons, Respondents' motion to dismiss the petition as untimely (ECF No. 15) will be granted and the petition in this matter will be dismissed with prejudice. No certificate of appealability shall issue. Petitioner's motions for oral argument on the dismissal motion (ECF Nos. 17 & 20) are denied. Petitioner's motion to stay the case (ECF No. 22) is denied as moot. An appropriate order accompanies this opinion.


DATED:  January 30, 2018                                   /s/ Freda L. Wolfson
                                                          FREDA L. WOLFSON
                                                          United States District Judge